GOODYEAR RUBBER CO. (GUTTA PERCHA & RUBBER MANUF'G CO. v.). See Case No. 5,879.

GOODY FRIENDS, The (WESTERN INS. CO. v.). See Case No. 17,436.

## Case No. 5,604.

### In re GOOLD.

[2 Hask. 34.] [1]

District Court, D. Maine. Feb., 1876.

PARTNERSHIP—CONDUCT AS ESTOPPEL—VERBAL ADMISSIONS.

1. A partnership does not exist from an agreement to form one in the future.

2. An advance of money by one to another in contemplation of their becoming co-partners at a future time does not work a copartnership.

3. The conduct of parties alleged to be partners is competent evidence to show the copartnership.

4. Conduct to estop one from denying that he was a partner in a business firm at the time of its bankruptcy, and liable for its debts, must have been so open and notorious that all the creditors believed him to be a partner in the firm, and were thereby induced to become its creditors.

5. Verbal admissions, from the inability to correctly hear, understand, remember and communicate the precise conversation, are usually unreliable and unsatisfactory testimony.

In bankruptcy. Petition by the assignee of a bankrupt to expunge and disallow the claim of a creditor, proved, and allowed against the bankrupt estate by the register, upon the ground that the bankrupt and creditor were copartners and not debtor and creditor. The creditor by answer denied the copartnership, and proofs were taken. The matter was heard by the court, all right of appeal being waived.

Moses M. Butler, for petitioner.

Thos. H. Haskell and William L. Putnam, for respondent.

FOX, District Judge. Wm. N. Goold commenced business in this place as a banker on the 24th day of June, 1872, in the banking rooms of the late Second National Bank, of which institution he had been the cashier for nearly three years immediately preceding. He continued in the banking business until the 4th of May, 1875, when he failed. At the June term of this court he was adjudged a bankrupt on the petition of his creditors, and Franklin J. Rollins was chosen his assignee. The business was carried on by him in the name of the Bank of Portland, with an alleged capital at its inception of $10,000. Goold had numerous depositors, and among others Moses B. Clements, formerly a member of the firm of E. Churchill & Co. His first deposit was on the 29th of December, 1873, and deposits were continued by him from time to time until December 30, 1874, at which date the total to the credit of Clements on this account was $32,984.47, nothing having at any time been drawn therefrom.

In April, 1874, Clements commenced another deposit account with the Bank of Portland, which was designated on the books as special. This account was kept along until the failure

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

of the bank, large deposits being made and checks drawn thereon, with a balance due to Clements at the failure of the bank, upon this special account, of $2,968.45. Both these sums Clements has proved against the estate of Goold, and the assignee has petitioned this court to disallow these claims on two grounds: I. That Clements was a partner with Goold in the business transacted under the name of the Bank of Portland. II. That Clements was not a creditor by reason of his withdrawal from the concern of more than $42,000, for which he was indebted to the Bank of Portland, and which should be allowed in offset of the claims so proved by him.

The parties have entered into a written stipulation that my decision shall be final and conclusive between them, the right of appeal being waived. By this agreement it becomes my duty not only to pass upon the right of Clements to this large sum of money, but I am compelled to determine which of these parties, Clements or Goold, is, in my opinion, unworthy of confidence, as their sworn statements in respect to the points in controversy are wholly irreconcilable. Before this case was brought before me, I was entirely unacquainted with these parties; but it is conceded on both sides that up to the time of the failure, each of them sustained in this community the reputation of upright, honest, truthful citizens, neither whom had ever been suspected of dishonesty of any description. The responsibility of deciding between them now devolves upon me, and however much my opinion shall reflect upon one of them, I have endeavored to ascertain the truth by as careful and complete an examination of their statements and of the evidence relating thereto as is in my power, and will now, as briefly as possible, declare my conclusions and the reason therefor.

Clements and Goold were examined at great length before the register respecting these transactions, and their examinations have been read in evidence. Clements has also been recalled at the hearing. In relation to the copartnership between them, Goold states that in December, 1873, he and Clements had an interview on the subject. He showed him his books and accounts, explained them to him as fully as he could, and Clements promised to take the matter into consideration. At the second interview he says: "I told Clements that as I needed more funds to carry on the business. I thought the best I could do would be to take a partner. Clements asked how much capital I should expect to offset my business and capital in general copartnership, and I told him $40,000 would be a fair equivalent to offset my business in an equal copartnership. Clements at first demurred, but finally agreed to that sum. He stated that his funds were so invested that he could not put it all in at once, but that he could within six months, by realizing his investments, get in about $30,000 as he thought, and that if he could make satisfactory ar-

rangements he would get in the balance as soon as possible, but that it would have to come from the firm with which he was formerly connected. I then told him that I had always dreaded having a partner, that I would not go into business with any live man until he had been in and out my place of business, had become familiar with the business and my ways of transacting it, and I had become thoroughly acquainted with his ideas and methods of doing business. I told him that I was short of funds, and that if he wished to go into the business, he could, as he could realize on his securities, put the money into the business of the bank, and I could give him collateral security therefor in the shape of notes of my discounted loans, and he should come into my place of busines, make his headquarters for business purposes there, to enable us to become familiar with each other and our methods of transacting business, and then at the end of one, two or three months, as I expressed it, if we liked one another and could agree upon terms of copartnership, we would enter into a copartnership in the business. He agreed to my proposition, came in and made my place of business his headquarters for business purposes, commenced putting in money the last of December, 1873, and continued putting in money until May, 1874. He had deposited over $30,000 in the business for which I had given him collaterals as agreed. About the last of May, 1874, I told him that I thought it was time that we came to some conclusion in regard to our copartnership; and in talking the matter over, he expressed himself as entirely satisfied, both with the business and my method of conducting it; and we talked over the matter of copartnership and made the following agreements: First, that Clements should offset my business with $40,000 additional capital, my division to be considered as $40,000 in any division of profits, making it an equal copartnership; that all profits and losses were to be equally divided; that neither of us should endorse commercial paper, sign bonds or otherwise render ourselves financially liable outside of the concern; that when any division of the profits was made, it should be at the rate of seven per cent. About this time, he gave up and returned to me, to be replaced as a part of the loan of the bank, all the collaterals which he had received from me that were then in his possession, and he also spoke of giving up his bank book containing the credit entries of the money he had already contributed towards his proportion of the capital. I told him he had better wait until our copartnership papers were drawn; and a short time after this, I spoke in regard to making copartnership papers, and he wished to delay it, saying that he wanted to defer it a short time; that Mr. John Lynch wished him to take an interest in a scheme at Washington. After that, he gave numerous excuses for delaying the execution of the papers, and finally as an excuse, that his name was on outside

paper as an endorser; that he was obliged by circumstances to continue it to keep his business matters along and for his good. This was his excuse up to the time of the failure, and the articles of copartnership were never executed."

Clements in his examination states, "At the time I began my deposits in December, 1873, there was a talk between Goold and myself about going into partnership. I was to put in $20,000 to $30,000 and have collaterals, with the privilege of trying three months or more to see how I liked the business, and to have interest at seven per cent. on my money deposited in case I did not like it. I was to draw out my money at any time. In case I stayed and liked the business, I was to have a percentage of the profits. The percentage was not agreed upon. He required $30,000 as an equivalent for his business and capital. I was not willing to give so much. The question as to the percentage I was to have, if I went in, was never settled. I received collaterals from Goold which were kept by me in my trunk in Goold's vault. When I went to Boston I left some of the notes outside, so that he could take them in my absence and make them good. He complained that he could not get at the notes as they were coming due in my absence, and I took them out of my trunk and left them in the vault, Goold agreeing to make them good at any time. I was absent a good deal of the time. Goold gradually used up all the collaterals, and they melted away in August and September, 1874; were all gone by the last of September, or 1st of October. I had the privilege of the small room at the bank as my office, which opens out of the bank. It was definitely settled January 1875, about the third week, that I should not be a partner. Goold showed me the result of his business for the year on a half sheet of paper. I told him that was no business for two, but that it was good for him; that I would not withdraw my money to injure him until I found some business where I wanted to use it. He replied I could have it any time. There was no settlement made in February. I spoke to him about making good my collaterals, and he replied, he was using a good many notes at the Everett just then, but would make it good soon. I had the utmost confidence in Goold's honesty, and had heard of no losses and felt safe." Clements testified that he never did agree to become a copartner with Goold, and that he informed him in January that it was his determination not to form a copartnership under the option which he claims to have had until that date.

Goold and Clements substantially agree in these particulars; that the deposits made by Clements were so made by him originally, with a privilege on his part to become a partner in the concern on his contributing a fixed sum as capital, the precise amount of which sum, however, is in dispute between them, and that if Clements did not elect to form the copartnership, he was to receive back his money with interest at seven per cent.; that he occupied for his own purposes the small office connected with the banking-room, and deposited from time to time his money in the bank amounting on the 1st of June, 1874, to $25,784.

At this point, the conflict between them arises; Goold swearing that previous to that date, in May, they entered into a definite and complete agreement to become copartners together in this business; that Clements then exercised the option which up to that date, he had, whether he would or not become a partner with him; that he made his election and agreed so to do, and that from that time forward to all intents and purposes he was an actual partner with Goold in the business there transacted under the style of the Bank of Portland.

Clements stoutly denies that any such arrangement was then completed and determined upon; but on the contrary, he avers that everything between them continued in the same uncertain, indefinite condition, as it had originally been; that there was no change whatever in their relations, and that he did not then, or at any time thereafter, agree to become absolutely a copartner with Goold; that the right of election so to do still remained to him, as it had been from the first, until the latter part of the following January, when he notified Goold of his determination not to become a partner in the concern. The difference in the sworn statements of these parties is manifestly utterly irreconcilable, and one of them has testified falsely in relation to this matter; these were matters personal to themselves, their own personal contracts and agreements, within their own personal knowledge, and in regard to which there can be no question from failure of memory or by reason of mistake.

According to Goold's statement, this copartnership was agreed upon between them the last of May, 1874, and continued in full force until the failure of the bank the May following. We may with great propriety, and probably with great profit, in determining whether these parties were copartners, examine with care their actions and conduct and their connection with the business of this concern during this year, and what each of them did in relation thereto. The old maxim that "actions speak louder than words" is not without much truth; and whether these parties did or not thus sustain the relation of copartners, we certainly ought to be able to find out, if we can ascertain and scrutinize their conduct during this long space of time.

And first, let us examine Goold's transactions and conduct, and from them learn whether a copartnership existed between him and Clements. According to his state-

ment, the capital, after the formation of the copartnership, was to be $50,000. He had contributed $10,000 and Clements $25,-000 or $26,000, and was bound by his agreement to make good the balance. Previous to that time, Goold's return under oath to the collector of internal revenue set forth his capital at $10,000. On the 31st of May and the 30th of November, 1874, he made his returns for the preceding six months as required by law, in each of which he stated his capital, as before, as being only $10,000; and he included as part of his deposits the amount standing on his books to the credit of Clements. In October after the failure of the bank, his return was that his capital was wholly lost. Each of these returns was after the alleged copartnership was formed, and after Clements' deposit had become a part of the capital of the bank as Goold now swears. But these returns by him under oath do not indicate any increase of capital from any source; and it is certainly extraordinary that he would deliberately commit wilful perjury in this matter, by thus misrepresenting the amount of his capital, when by thus doing, he could not possibly derive any advantage therefrom, as it would not in the least affect the amount of tax to be paid by him, whether this sum was included in capital or in his deposits, as it was liable to be taxed at a like rate under either head.

Again, the business was carried on under the style of the Bank of Portland; but so far as it appears, Goold was the sole party held forth to the world by his advertisements, letters and other documents, both before and after the alleged partnership was agreed upon, as beneficially interested in this business. There is no satisfactory evidence that on any occasion after May, 1874, did Goold represent that Clements was his partner; but so far as is shown, he, and he alone claimed to be the party in interest in the business which he carried on in the name of the Bank of Portland. Subsequently to May, this business was wholly managed and controlled by Goold, the same as it had previously been. His clerk was not aware of any change in the relation of these parties. No entry anywhere appears upon the books, nor was any memorandum of any kind made, to indicate that Clements after May had become jointly interested in this business. In every respect, so far as I can discover, everything was in statu quo, and Goold controlled the whole business without consulting or advising with Clements relative to the business of the bank, as it would have been expected he would have done if Goold's statement is true. If Clements or any other person was interested jointly in this business with Goold, we should suppose that Goold would have kept an account of the expenses of the bank, and of the profit and loss which accrued; but nothing of the kind was done by him, and no entries are anywhere to be found which give any information of the profits or expenses attending the business after the date of the alleged copartnership.

Certainly this is not the usual course adopted between parties when such relations exist, as there would be no means of determining the profits which each would be entitled to at the close of the business. In some instances, bills against Goold have been found amongst the papers which have been paid by him, and which contain charges, some of which were personal to himself, while others were on account of the business of the bank and a proper charge in its expenses; but Goold is not shown by any entry whatever to have apportioned them or charged the copartnership in any way therefor.

Goold swears that the capital which Clements was to contribute to the concern was to be $40,000. On the 1st of June, 1874, only $26,000 had been paid in by Clements; this amount he increased by a deposit of $1,000 in June, $3,000 in July, $1,600 in November, and $1,500 in December, making in all about $33,000. It is shown that, during all the time after the 1st of June, the bank was in very great need of assistance. Goold was very frequently compelled to obtain in Boston, a re-discount at 8, 10, or 12 per cent., with sometimes a commission of one-fourth of one per cent., notes which he had discounted at $7^3/_{10}$; and his necessities were so great that, during this time, he remitted hundreds of thousands of dollars through the express company, depositing the amount at the office in this city, and thereupon, notice was sent to the office of the company in Boston by telegraph, who would on the same day, by check or cash, pay this amount on Goold's account into the Everett National Bank. All this was attended with the exorbitant express charges, of one-fourth of one per cent. for doing the business in this way, and frequently with the loss of one day's interest charged by the Everett Bank. The money thus paid by Goold, was frequently obtained by him from other banks in Portland on sight drafts on Boston, drawn by him on the Everett, which had to be provided for by him in a similar manner the day succeeding. Would Goold have incurred such heavy losses by the large discounts which he had to allow, and by such express charges, if he then had the right to require Clements to contribute to the capital of the bank the amount he had agreed, a considerable portion of which was never paid by him? Would he not rather have fully advised Clements of the manner in which he was conducting the business, and of the heavy losses and expenses to which they were thus subjected, a large portion of which would have been avoided, if Clements had paid into the concern the balance of the amount which he had agreed to contribute as capital, and which at any moment he was able to make good if re-

quired so to do by the terms of a copartnership?

M. C. Patten, a very skilful and intelligent accountant, has, with great labor, examined the books and vouchers of the Bank of Portland from the time of its beginning business, and carefully compared them with the accounts rendered by the Everett National Bank; and he states that "from the day the Bank of Portland commenced business until the day of its failure, there was not a day in which its books were correct." The very first day, a false entry was made of $5,000 remitted to the Everett National Bank; and from that time onward, the books are a complete tissue of false entries, as for instance, Mr. Patten says "the books of the Bank of Portland showed to its credit as due from the Everett Bank on an average about $20,000 more than the Bank of Portland was entitled to." On July 23, 1874, there is charged on the books of the Bank of Portland to the Everett Bank $33,000, not one dollar of which was ever remitted. This was done by Goold to reduce his "cash items," which had been accumulating and carried along for some time; but on what account they originated does not anywhere appear; nor is it shown that the bank ever derived the least advantage therefrom. It is hardly to be believed, that if such wholesale frauds were thus perpetrated by Goold in the management of the business of the bank, they could have been entirely concealed from Clements, if he was a general partner, taking that interest in the management of the affairs of the bank which a partner having so large a sum at stake in its welfare would ordinarily be likely to do, especially when it appears that he is a merchant of extensive experience, was in and about the bank much of the time, and if a partner, would have had access to the books, correspondence, and all other papers. The risk of discovery of his frauds was so great and constant, that I cannot believe Goold would have so conducted, if he was liable to detection by a partner at any moment.

From the day of the commencement of its business until its close, the ledger of the bank purports to show its daily condition; and it there appears that from day to day the capital of the concern was daily entered by Goold as $10,000. No change was made by him in this entry after May, 1874, when as he says Clements' deposit had become a portion of the capital; but this deposit of $32,000 from day to day is carried forward to Clements' credit until the failure of the bank, as a deposit by him, and the capital remains but for the original amount. Would this have been so, if during all that time the condition of things was entirely the reverse, and Clements was no longer a depositor of this sum, but a copartner who had increased the capital fourfold by his additions thereto? A daily falsehood of this kind, it is hardly to be believed Goold would have so persistently and daily reiterated.

Goold's personal expenses during this year were quite large, probably more than $2,500, all of which were paid from the bank; but there is nothing whatever entered on any book of the bank to show what amount was withdrawn by him on his account, or for his own personal use. This, certainly, is not the usual manner in which copartners deal with the copartnership estate; and such proceedings would render it impossible to adjust between them any settlement of their affairs; and if it may be said that these sums were probably entered elsewhere by Goold, the objection in that case would be equally cogent, for where a copartnership exists, the books of the copartnership should exhibit the true state of the accounts with the individual members; and whenever a party has so kept the books of a concern as nowhere to indicate therein that any other person than himself has any interest in the business, we may well infer from his silence that he is the only party interested.

On May 25th, 1875, Goold made an assignment of all the assets of the bank to J. H. Drummond, to secure him for procuring bail for Goold. This instrument was carefully drawn by counsel. There is a full schedule of all the unpaid notes which had been discounted at the Bank of Portland, and which were pledged to the Everett Bank, as is set forth in the assignment, but subject to that pledge; they are assigned by Goold as his own private individual property, and for his own individual benefit and advantage, and to be accounted for to him when the purposes of the assignment were accomplished. Surely, this was not the action of a copartner, dealing with the copartnership effects; and if Clements as a copartner was a joint owner in this property, Goold would never have undertaken to transfer these notes, as if they were his sole property. Such an act by him is a most direct and positive assertion that the property was his alone, to deal with as he chose, for his own use and advantage, and that no one, either partner or any one else had any right whatever to forbid his so dealing with it.

On the 22d of June, 1875, Goold, in obedience to the order of this court, made his return under oath of a list of his creditors, and upon that list he has entered the name of Clements as a creditor for both of these claims now presented by him. If Clements was a copartner with him in the business of the bank, Goold has committed perjury in returning him as a creditor for these large sums, while if he was not a partner with him, this statement of Goold is absolute verity. Clements joined in the petition with the other creditors praying to have Goold adjudged a bankrupt. If he was a partner, he would hardly have aided as a promoter of such a movement; nor would Goold have sanctioned it by his silence, as

for this cause he could have defeated the petition against him, and it is within the knowledge of the court, that he was not willingly decreed a bankrupt, but delayed and protracted the adjudication as long as possible, demanding a jury trial, and compelling the petitioners to be present at Bangor prepared for trial. In his conversation with Edward Gould in July, 1874, when informed by him that he understood that Clements had gone in as a partner, and that if he expected any credit he must advertise and make it known, William N. Goold stated, that he and Clements had not got the matters fixed, and that Clements was not ready to complete the partnership so as to advertise.

On Feb. 2, 1875, in reply to a letter from Edward Russell's agency in Boston, Clements wrote denying his liability for any of the transactions of the bank. Upon receipt of this letter, the bank was disrated at this agency, and thereby its standing materially impaired. Goold was informed of Clements' reply, but did nothing to contradict this statement of Clements. In no way or manner did he proclaim that Clements was his copartner; but he continued the business in all respects as before, holding forth that his capital was only $10,000, and that he was the party solely interested in the business. Every check, draft and endorsement after that date, so far as it appears, were executed by him in his individual name, without the least intimation that any other party thereby incurred any liability. If Clements were then really his partner, we cannot but believe that Goold would have been highly indignant at Clements' false statement and denial of his connection with the bank, and that the mercantile agency with the public at large would have soon been advised by him of the real condition of affairs.

Goold's first disclosure of a copartnership between himself and Clements was made in his affidavit of Aug. 2, 1875, in which he swore that "on or about the 1st day of January, 1874, having before that time loaned me money for use in the Bank of Portland for which Clements held collateral security in part, he surrendered said security and agreed to go into said business with me, furnishing the money then in said Bank of Portland as part of the capital, and agreed to divide equally with me the profits and loss of said business." But in his examination, Goold states the copartnership was agreed upon the last of May, 1874, and that the amount of capital which Clements agreed to put in was $40,000, thus contradicting his former affidavit in two material particulars; to wit: the date of the formation of the copartnership, and the amount of capital to be furnished by Clements, thereby demonstrating that no reliance can be placed on his statements in relation thereto.

Did the conduct of Clements after May, 1874, denote that he had become a partner in this concern? On an examination of all the testimony, I find nothing to have been done by him, which authorizes me to infer that there was any change in his relations to the bank from the commencement to the termination of his deposits. If he became a copartner in May, 1874, we certainly should expect, after that date, to find that in some way he would make manifest his new position; that he would assume some duty in its management and direction, and would not permit the whole charge and control to remain with Goold as if he were solely interested. It must be remembered that if Clements had become a partner, his interest was fourfold that of Goold, and for an amount, which considering his means, we may well suppose would induce him to give his own personal supervision, to some extent at least, to the business; yet so far as appears, his conduct was in all respects the same as when it is admitted he was a simple depositor, having placed his funds in the bank with the expectancy of becoming interested as a partner at some future day, if experience should satisfy him that it would prove to his advantage. We do not find that he kept any of the accounts of the bank, or ever received or paid out any of the money; and on but one or two occasions at the most, and in the absence of Goold, did he ever advise or direct about any loans or discounts, although he was ordinarily in the office adjacent to the banking room, which he used for his private purposes.

If he were a partner, we cannot but suppose he had access to the bank books and all the correspondence; and if so, as a merchant, he must very soon have discovered Goold's method of obtaining re-discounts of his loans at a heavy loss, and almost daily remitting funds by telegraph at a cost perfectly ruinous, all which Clements by his means and credit could have at once prevented, and which he certainly would have done to save his proportion of the capital, to say nothing of any profits which were more than consumed by Goold's proceedings. If he was not aware of these proceedings, it is, to my mind, strong proof that he was not Goold's partner, as any one of reasonable business sagacity could have ascertained without much difficulty the method in which Goold was conducting his business. Almost every week the correspondence between the Everett Bank and Goold, on file in the bank, would have disclosed to him Goold's management.

Again, if he were a partner, his curiosity would have prompted him at some time to compare the monthly statements rendered by the Everett with the accounts with that bank as standing on the books of the Bank of Portland; and he would at once have found a very great discrepancy, as Patten says, generally of more than $20,000, which must have put him on inquiry, and would have disclosed to him Goold's necessities and the straits to which he was reduced to carry

on the bank. So long as Clements was merely a depositor, he might well rely on Goold's exhibit presented on a small piece of paper, or on the daily balance as set down in the cash book. But partners, with so large an amount involved, would not for a whole year restrain their investigations within such narrow limits, but would become conversant with the real condition of things which ordinary inquiry would make manifest; for it must be remembered, that during this time Clements was not personally engaged in extensive business, but was comparatively a man of leisure, who, it must be believed, would frequently avail himself of the opportunity to ascertain for himself, whether the copartnership was or not well managed, and likely to prove advantageous to him.

It is not denied that Clements had for a long time been a prosperous merchant and a member of a firm doing a large and extensive West India business in this place; and he must have become well acquainted with the methods generally adopted by skilful merchants and accountants in transacting and carrying on their business; and he cannot but have known that expense accounts, accounts with profit and loss, and individual personal accounts with each member of the firm were requisite for a proper adjustment between them of the affairs of a copartnership. His investigations as a copartner would have shown him that not a single one of such accounts were to be found on the books of the Bank of Portland, which though they were not absolutely necessary, if Goold was the sole party in interest in the business, were indispensable, if Clements were interested with Goold in the profits, and which he would, under such circumstances, have insisted upon.

If Clements was a partner, he could not but be aware that his name added greatly to the credit and strength of the bank, and that the institution must have derived great advantage from its publicity. For the common benefit, therefore, he would have done all in his power to disclose his connection with the bank; but instead of so doing, on Feb. 2, 1875, when applied to by Russell's agency at Boston to state whether he was "personally liable for the obligations incurred in the course of business of the bank," he replied on the same day, "I don't know that I am at this time liable for any of its transactions, although I have $30,000 deposited in the bank, in the expectation of joining Mr. Goold in its business." This reply was perfectly suicidal to the bank, if he was a partner, as he could not but know that its credit would be much impaired thereby; and we cannot believe that one really a partner in a concern would adopt a course so manifestly detrimental; especially as he must have known that it was for Goold's interest forthwith to deny its correctness and insist on their joint liability as copartners.

The learned counsel for the assignee has very properly called the attention of the court to the conduct of Clements in three particulars, as bearing upon the matter of partnership; first, that his deposit of $11,-750, February 10, 1873, was not in cash, but was the net proceeds of certain notes discounted for him at the bank and passed to his credit, Clements thereby losing the amount of the discount. Two answers may be given to this objection; one, that the discounts were had in February, at which time Goold does not claim that the partnership had been fully agreed upon; and secondly, that from the time of the deposit, this amount drew interest at seven per cent. with a right, if Clements should prefer, to share in the profits then accruing; so that in any event the difference of interest would be slight, while his profit as a copartner might be far in excess of the interest. Another suggestion is, that there was no settlement and credit to Clements of interest at seven per cent. in January, 1875, at which time Clements says he informed Goold that he had decided not to go into business, as there in all probability would have been, if Clements' statement is correct. But in reply to that, it may be said, if Goold's version is true, the copartnership had continued from December, 1873, and at the close of the year, there should have been an adjustment of the profits and a credit to Clements of his share, which it is not pretended was ever done. Clements says he was only to let his money remain there until he found some business in which to employ it; and it might well be, that the computation of interest might be delayed until principal and interest were called for.

There is another suggestion of much greater significance, and that is the surrender by Clements of all his collaterals received from Goold, and which Goold, in his affidavit of August 2d, says were surrendered by him in January. But in his examination before the register, he fixes it at shortly after the latter part of May, and which, as he says, were then surrendered on account of Clements having become a copartner in the business. If that relation existed, he would have no occasion to longer withhold the collaterals, and it would be natural that Clements should do as Goold swears he did. Clements says "that at the commencement of his deposits, he received collaterals therefor, and held them till the next summer, allowing Goold to collect them as they fell due, being the loan of the bank under his promise to make them good; that when he was about to be absent from the city, he put them in the vault where Goold could have access to them; that this was done at Goold's request, he promising to replace them, and they all melted away, being finally closed out in September or October." Such conduct on Clements, part was certainly inconsistent with his previous conduct in requiring this security

for his deposits and is hardly to be expected from prudent and cautious business men. But Clements swears he did this for Goold's accommodation; that he had entire confidence in him, had no reason to distrust his statements and exhibits to him, relied on his assurance that the collaterals should be made good, and finding that many other depositors, cautious business men in this place, were manifesting their confidence in him by making very large deposits in the bank without exacting security, he was induced to do likewise and not insist on further collaterals in place of those which had been paid. This is not the first instance within the knowledge of the court, in which one having security for very large amounts has surrendered it all to his debtor, relying on his assurances to make it good, and has at last been deceived; and it may be, that Clements' statement respecting the collaterals supported by his oath is correct; but this transaction certainly affords some support to Goold's statement of this matter; and if it had been corroborated in other particulars, might have exerted great influence upon the decision of the cause. It is, however, only one of many circumstances, all of which must be weighed by the court, before arriving at a conclusion upon the question at issue.

The assignee has examined a large number of witnesses as to the acts and declarations of Clements, in the nature of admissions on his part, to satisfy the court that an actual partnership existed between Goold and himself. Before we proceed to examine this testimony, it may be well to refer to the authorities, as to the reliance which courts of justice should place on evidence of this description. Prof. Greenleaf says: "With respect to all verbal admissions, it may be observed that they ought to be received with great caution; the evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake, the party himself, either being misinformed, or not clearly expressing his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. But where the admission is deliberately made and precisely identified, the evidence it affords is often of the most satisfactory nature." 1 Greenl. Ev. § 200.

From my own experience, I have for many years been of the opinion that statements of verbal admissions of a party are the most unreliable and unsatisfactory of all human testimony. In re Moore [Case No. 9,751]. It is hardly ever the case, that a witness will repeat the conversation twice alike, and yet, in most instances, we find them swearing with positiveness, that they give the precise language used by the party. The fact really is, that not one time in ten does a witness testify directly from positive remembrance of the language as spoken; but he clothes in his own words the idea which he then has of what he heard. It is but seldom that a casual conversation is fixed so indelibly in our memory, that we can repeat it verbatim months or years afterward; and I confess, my suspicions are excited, when I so frequently hear witnesses pretend so to do. If any one will undertake the experiment and test his own memory as to a casual conversation with a friend six months since, he will find that in most instances he will be wholly unable to speak with certainty the precise language employed, while there may remain, impressed with distinctness upon his memory, a general idea of the nature and effect of the conversation. The memory of the most honest and intelligent person is liable to mingle with the transaction subsequent facts and occurrences, and statements of other parties, and, as Judge Redfield remarks, "from the impossibility of recollecting the precise words used by the party, or of translating them by exact equivalents, we must conclude there is no substantial reliance upon this class of testimony."

The most important witness as to admissions of Clements is T. F. Jones, the Portland manager of Russell's Mercantile Agency. He testifies: "Somewhere between the 15th and 20th of May, 1874, I went to the Bank of Portland, in consequence of an inquiry made of me, to know if Clements was a general partner in the concern. I saw Mr. Clements, and in answer to my inquiry if he was a general partner, he replied that he was, and that he was considered holden for the liabilities of the concern. On his statement, the rating of the Bank of Portland was raised from $10,000 to over $50,000. Clements promised that an advertisement should appear by July; and in November he gave an explanation, that the reason why he did not advertise was, that he was connected with some operations of Twitchell, Champlin & Co., and that his name was loaned considerably on the street, so that it would not lend a great deal of strength to the concern, if he did then become a partner. He then promised that it should appear by the first of January; but it did not appear. I notified them that unless there was some advertisement by which I could be fully satisfied that Clements was a partner, the rating would be reduced or suspended. February almost expired and nothing was done, and I wrote to Russell, and thereupon the correspondence took place between Russell and Clements, an abstract of which is before given."

The most important portion of this testimony is the positive unqualified declaration of Clements made between the 15th and 20th of May, 1874, that he was a general partner, holden for the liabilities of the concern. Mr. Jones seems to have followed this matter

with a good deal of persistency on his part, and to such an extent, judging from other testimony, as to have produced some ill feeling between the parties; but admitting that Jones intended to state the exact truth in relation to this conversation, I am entirely satisfied that he is somewhat mistaken, and has represented it much more strongly against Clements than his language really warranted. He has testified, not from his memory, but from his inferences after a process of reasoning on his part upon his own subsequent actions. His own report which he made in relation to this interview satisfies me that the partnership between these parties was not fully and definitely agreed upon, but that Clements then expected to become a partner, and that such expectation was then communicated by him to Jones, the precise language employed by him not being within Jones' recollection, but which he now chooses to declare was a direct affirmation that a general partnership then existed between these persons.

On the 20th of May, 1874, Jones wrote to E. Russell, in Boston, as follows: "Bank of Portland, May 20, 1874. Moses B. Clements, late of E. Churchill & Co. has already put $27,000 into this concern, and intends to put in more as soon as he can realize, and will be advertised as general partner; is so now virtually. This will put the bank in good standing and credit. Clements is worth $50,000 to $75,000." This statement, in its bearing on the question of an existing partnership, is certainly not an affirmation on Jones' part that at that time it had already been created and was in full force, but only that it was to be in the hereafter; that a large sum of Clements' money was in the concern, which he was to increase, and that "he will be advertised as a general partner." Then comes the significant expression; not that he is actually then a partner, but that he is so now "virtually." This word "virtually," Worcester defines "as in effect, though not actually." Jones, therefore, must be understood by employing this word, in speaking of the copartnership, as intending to convey the idea, not that the copartnership was then an actually fixed and completed thing, but that it would take place, and that what had already been done was in his opinion equivalent to the formation of a copartnership, although something more remained to be done before it would become absolute and obligatory. If Clements had absolutely and squarely said to Jones that he was then a partner, we should never have found Jones in his correspondence with Russell using any ambiguous phrases; but he would have stated directly, that the partnership did in fact then exist, and that Clements had so declared to him. He would never have employed language to convey the idea that the partnership did not then actually exist, which is the real signification of his report.

But there is other evidence which is conclusive in this matter. This conversation between Clements and Jones, whatever it may have been, must have taken place prior to the 20th of May, as that was the date of Jones' letter to Russell in relation to this matter. Goold in his examination in relation to the precise date when the copartnership was agreed upon between him and Clements in various places, says it was "the last of May," or "about the last of May." From the 15th to the 20th of a month cannot be considered as the last of the month, or about the last of it; and therefore, according to Goold's testimony, there was no copartnership in existence between Clements and himself at the time Jones says Clements admitted he was a partner. Some reliance is placed upon the statement of Clements as given by Jones, that he agreed to advertise the partnership. That great caution is requisite in the consideration of Jones' testimony is, I think, demonstrated; and to my mind, it seems quite clear, that as Clements had not then abandoned the idea of forming a copartnership, he might well speak of his advertising it, and that he expected so to do when the arrangement was concluded between them; and this is all, as I believe, that he ever intended to signify to Jones in any of his conversations. His language at one time as given by Jones, if his statement of the conversation could be depended upon as strictly accurate, would clearly indicate that the matter was not completed at that time, as Jones says Clements told him in November, "it would not lend a great deal of strength to the concern if he did then become a partner;" manifesting, most clearly, that he was not already a partner.

Edward S. Hamlin testified that he was a member of the firm of F. A. Hamlin & Son, who had on deposit in the Bank of Portland at its failure $3,396; that before becoming depositor he had a conversation with Clements on Exchange street; "told him I thought of changing our bank. He said, he should be glad to have us come in there, and that he would use us as well as he could, gave me the names of some of their depositors; said everything should be satisfactory, the paper should be discounted at 7 3/10, and if everything was not satisfactory to let him know. Had notes discounted, but never did the business with him when I got discounts, but with Goold. Once, on Cross street, I asked him if we could be accommodated with a short discount. He said 'Yes,' he thought I could, but I had better see Goold. I did, and he said 'Yes.' On cross examination he says, 'Clements never told me he was a partner.' On Cross street Clements said I could have the short loan, but I had better see Goold."

The testimony of this witness illustrates how little reliance can be placed on absolute accuracy in evidence of this description; as in one instance he stated that in the conver-

sation on Cross street with Clements, his reply was, "Yes, he thought I could be accommodated," &c.; while in but a few minutes afterward he says Clements' reply was that "I could have the loan, but I had better see Goold." In the latter case a positive consent to the proposition; an absolute disposal by him of the funds of the bank, which would be evidence of a right on his part to their control; while the reply, as first given, was a mere expression of opinion on his part, with a reference to the manager of the bank.

It is impossible to say, therefore, just what did take place on that occasion, although there can be but little doubt that there was some conversation about a loan, with a statement of some kind from Clements of more or less assistance from him in obtaining it. Some allowance must be made on account of the deafness of this witness, which was so great at the trial, that he was examined with difficulty by counsel standing near to him; but conceding that we have the substance of what passed between the partners, all that can be fairly deduced from it is, that Clements was desirous of obtaining depositors in the bank, and was ready to assure them of such accommodations as they might require, all of which he might well do, relying on his influence with Goold, and his expectation of afterwards becoming a partner in the business, the profits of which he was to share from the time of his deposits. The great interest which he had in the concern at the time, as its largest depositor and prospectively as a partner, might well induce and authorize all that he said to Hamlin, although he had not then actually become a partner; and for the same reason, he might well have assured Levi F. Hoyt that a note of Foss', which Clements was willing to endorse, would be discounted at the bank, and would also account for his discounting from the funds of the bank during Goold's absence a note for Hoyt of $200 or $300, which was good beyond dispute. By such accommodations he was befriending the customers of the bank, the profits of whose business he expected afterwards to share with Goold.

The testimony of Wright, Willard, Sanborn and Witham, for the same reason, is entirely reconcilable with a condition of affairs in accordance with Clements' testimony; and when that is taken into consideration, the testimony of these witnesses, as to Clements' declarations, is satisfactorily explained, without necessarily requiring that an actual partnership existed.

Albion T. Sawyer was examined orally, and Simon F. Tufts by deposition. They were copartners in trade on Commercial street, and were both present at a conversation with Clements on the 23d of April, 1875, at their store. Sawyer says he asked Clements if he was interested in the Bank of Portland, and he replied that he had more money there than any other man, and that

it was all right; that Goold had not been in any speculations to lose anything, and was an honest man, and that we should be safe; that he had access to the books any time that he chose. Tufts says: "After Clements said he had more in there than any other man, one of us asked him to tell us whether the bank was safe or not. Clements said he believed it was, as he believed Goold was an honest man, and that he believed Goold was right and straight." He then adds what Sawyer did not state, that "Clements said his business was on the wharf, took most of his time there, so he did not spare much time in the bank and left it with Goold to manage. He said that the books were open to his inspection at any time, and he believed everything was right and straight. If he didn't he shouldn't leave his money with Goold."

Admitting that we have the substance of this conversation, I find nothing in it but what so large a depositor in any banking institution might say although he was not a partner. The whole idea from beginning to end to be drawn from this conversation is, that his money was with Goold on deposit, and not that he and Goold were jointly interested in the business there transacted, and that at that time he had confidence in Goold, and intended to express that confidence to Tufts and Sawyer; and his language throughout the conversation certainly implies that he was a creditor of Goold and not a partner, and that his money was in the bank the same as other depositors, although to a much larger amount; but there is another fact of very great importance to be remembered in connection with this testimony, and that is, that prior to the conversation with these two witnesses, Clements on the 2d of February had publicly and in the most notorious manner, almost as open as by a public advertisement, by his own letter assured the mercantile agency that he was not a partner; and this statement had been communicated to Russell's subscribers, and had become so generally known as to occasion great distrust of the credit of the institution. After that, it can hardly be supposed that Clements said or did anything, in contradiction of his written denial, which should be deemed an admission by him of his being Goold's partner.

George Humphrey says that between February and April 1875, Clements, in reply to his inquiry if he was in the importing business, said that he was not; asked him what business he was in; he said "In the banking business—a private bank." This conversation took place after Clements' denial to Russell; and while perhaps he may have spoken of his place of business being at a private bank, or that he was transacting business at such a bank, it is not necessarily to be understood that he intended to declare that he was a partner in such an institution.

The testimony of Clements, that he was never a partner with Goold in the Bank of Portland, was sustained on all points by every act and declaration of Goold while carrying on the business, by his repeated admissions to numerous witnesses before and after his failure, and by his solemn oath. Clements' conduct and behavior, during the time in which Goold says the partnership was in existence, is in almost every instance in conflict with that we would naturally expect to find if a copartnership existed. The evidence of Clements' declarations does not support the theory of his being a copartner to such a degree as to cause me to doubt Clements' sworn statements and denial of it; and I am of the opinion, that the petitioner has failed to establish the partnership as alleged.

So long as a mere agreement for a partnership exists between the parties, the actual partnership has not commenced and does not exist. Gabriel v. Evill, 9 Mees. & W. 297, clearly establishes the proposition that a mere advance of money on a prospective partnership, or in contemplation of a partnership not finally agreed upon, does not make a partner of the person who advanced the money; Lord Abinger saying, "the defendant clearly was not a partner until he had exercised the option given him of declaring himself such." One not a partner may incur all the liability of a partner by allowing himself to be held out to the world as a partner, or by so conducting himself as to induce all the creditors of the concern to believe that he is really a partner, and for that reason to give credit to the business. By so doing, he may be rendered responsible to the same extent as an ordinary partner; but his conduct must have been so open and notorious, that all the creditors must have fairly believed that he was a partner; and having induced them to act on that belief, although it may be proved that it was expressly stipulated that a partnership should not exist, he is nevertheless, in such a case, estopped from disputing it. For the purposes of this decision, it is sufficient to say that there is not found in the testimony the requisite evidence to render Clements thus accountable, by estoppel, for the debts of the Bank of Portland.

It is possible that some of the depositors might in an action at law against Clements establish a special liability to them on this ground; but as at present advised, on the evidence before me, I should hesitate, before I could hold him accountable to any one of them. If such liability had been already fixed in a judgment at law against Clements, it would not control the present proceedings, as it would be a matter merely personal between him and his judgment creditor, which might well exist in that particular instance by reason of Clements' conduct with such creditor, but which would not affect the right of any other depositor.

Goold swears that Clements has withdrawn from the concern $42,070; and it is therefore claimed that his proof of debt should be rejected, as the amount so withdrawn was more than sufficient for the payment of both of his deposits. The burden of proof to establish this objection rests with the assignee. If the deposits have been paid, he must establish the fact; and the only testimony he presents is Goold's examination, in which he does state that this amount was withdrawn by Clements. This statement, Clements absolutely denies. The court might rest, therefore, upon this denial, by oath against oath, and simply say that the assignee has not by the uncorroborated statement of Goold overcome the denial of Clements. But after this protracted investigation, and the serious nature of the charges against Clements, I feel fully warranted in saying that Clements has proved most conclusively the falsity of this statement of Goold's and that it is clearly demonstrated that Clements did not receive the amount thus claimed by Goold to have been paid to him.

In June, 1874, Goold made oath that these deposits were all justly due from him to Clements; but in August he swore directly to the contrary, and in his examination before the register, he produced a list of amounts, as he said, paid out by him on checks of Clements, commencing May 2, 1874, with one for $4,895, the next payment being Sept. 15th for $2,100, and continuing till March 26th, the whole amounting to over $42,000, about $7,000 in excess of all Clements' deposits. Goold produced the check of Clements for the first payment. The others, he says, were surrendered up to Clements after the failure, the check produced having been accidentally mislaid and not given up as was intended; but he says he retained an accurate list of the checks, which is the same produced.

This check of May 2d for $4,895 is signed by Clements and payable to Twitchell, Champlin & Co., and notwithstanding Goold's testimony, it is established beyond question that it was drawn out of the amount of a note of Twitchell, Champlin & Co., for $5,000, payable to Clements and discounted on that day at the Bank of Portland, and for which Clements drew this check in favor of Twitchell, Champlin & Co., it being for the precise amount of this note less the discount.

The books of the Bank of Portland do not show any entry of this note, or that Clements was ever credited with this sum. The check came through the clearing house, and it is plain that it grew out of the discount of this note, and that if Clements is chargeable with the check he is entitled to the credit of the note, less discount, which was paid by Twitchell, Champlin & Co., when it fell due. The next check was paid, as Goold says, on the 15th of September. In all there were twenty-three in number, of various dates and for various sums.

The attention of Mr. Patten was called to these statements of Mr. Goold, and to the dates and amounts of these checks which Goold swore were paid by him in bills to Clements, and Mr. Patten testifies, that, from the books of the Bank of Portland and the accounts rendered by the Everett Bank, he has opened an account between Goold individually and the Bank of Portland from the commencement to the close of the bank, and that after making Goold every allowance which from any source he can find that Goold should be entitled to, there existed a deficiency and indebtedness of Goold to the bank at its failure of $62,000; that about $50,000 of this existed prior to Sept. 15th, 1874, and that only $13,000 of deficiency occurred after that date; and as Goold's statement is that Clements, after September 15th, received over $37,000 from the bank, the falsity of his statement is apparent.

A deficiency of $50,000 already existed prior to the time when Goold charges Clements with receiving from him this large amount; and it is certain that $37,000 could not have been drawn out after September 15th, as the books show but $13,000 was subsequently abstracted. Mr. Patten also says that he has examined into and ascertained the actual condition of the Bank of Portland at the several dates at which Goold swears these checks were paid by him in bills to Clements, and he finds that on not one of those days did the Bank of Portland have on hand bills enough to meet the check which Goold avers was on that day paid to Clements, and that they could not have been covered up under "cash items," as there was not the necessary variation in these items to correspond with the dates and amounts. Goold's testimony before the register as to the giving up by him of these checks is as follows: "Clements agreed to use all his influence to obtain a favorable settlement of the affairs of the bank if I, on my part, would shield him from being a partner in the concern as far as I was able. He said that if I gave these checks up to him, he should destroy them at once, and then there would be no evidence that any such amounts had been drawn; that his deposit books and the books of the bank would agree, and that we could both swear they were correct, and that he would prove his claim with the other creditors and induce them to accept a settlement. He also took a solemn oath to me, at the time of the surrender of the checks, that "he would not wrong, cheat or defraud the creditors of one cent of the amount represented by these checks."

Goold admits that no one ever saw or heard of one of these checks before the failure; that no entry of them or their payment was anywhere made, and that his clerk was ignorant of their existence or payment. I am compelled to declare that the court places not the least reliance in this statement of Goold, as it derives no support whatever

from any source, and the falsity of his testimony is established in various matters beyond all question. I am clearly of opinion that these sums were not received by Clements as Gould testified, and I therefore dismiss this petition with the closing remark, that the assignee, after the disclosure of Goold, was required to present the claims of Clements to the court for its revision; that he has faithfully and diligently performed his duty in this matter, producing all the evidence which might tend to defeat the claim, at the same time allowing the adverse party free access to all books and papers and the results of their examination by the expert accountant, and acting with the fairness and impartiality becoming an officer of the court, actuated only by the purpose that the court should be fully informed as to the matters in controversy; and the result is, that in my opinion, nothing has appeared in this investigation in any degree to reflect on the honesty and integrity of Moses B. Clements; but he has a right to expect and demand from this community the same confidence and respect which, it is admitted, he enjoyed before he became in any way involved in the affairs of the Bank of Portland. Petition denied. Claims of Moses B. Clements established to the full amount thereof.